### In re STROBEL.

District Court, W. D. Arkansas, Ft. Smith Division.

Aug. 2, 1930.

J. H. Evans, of Booneville, Ark., for petitioner.

Geo. W. Dodd, of Ft. Smith, Ark., for trustee.

YOUMANS, District Judge.

The material facts are undisputed, and are stated in the certificate of the referee as follows:

"1. R. M. Thompson, who was an equal partner with bankrupt until March 13, 1929, and principally liable as such partner for the debt of Finkelstein Cloak & Suit Company, was sued by said creditor, who obtained judgment against him for $398.39, and upon execution against him he paid the same and now files his claim against the bankrupt's estate for the amount of said judgment.

"2. The said R. M. Thompson filed another claim for $9,792.73 against the bankrupt's estate, based upon three promissory notes of $3,000.00 each, dated March 13, 1929, which notes were executed by the bankrupt for part of the purchase price of Thompson's one-half interest in the partnership business of Strobel-Thompson Dry Goods Company. One of these notes is due January 5, 1931, another January 5, 1932, and the last one January 5, 1933.

"3. The trustee in bankruptcy filed exceptions to each of said claims upon grounds, concisely stated, as follows: (a) Because said claims are not provable in this proceeding against the creditors of the bankrupt and especially creditors whose claims existed at the time of the sale of Thompson's half interest in the business; (b) That said sale is void as against the creditors of the partnership, because the Bulk Sales Law of the State of Arkansas was not complied with at the time the sale was made; and, (c), because at the time of the sale the Strobel-Thompson Dry Goods Company, as a partnership, was insolvent, in that, the assets of the partnership were insufficient to pay the debts of the partnership at that time and said sale was fraudulent and void, and that there was no valid consideration for said notes.

"4. After hearing the evidence and the argument of counsel, I find facts as follows:

"(a) R. M. Thompson and bankrupt, in April, 1925, formed a partnership under the style of Strobel-Thompson Dry Goods Company, and purchased a stock of goods and merchandise located at Paris, Arkansas, from the estate of Ike Pahotski, deceased, for about $19,000.00, and borrowed from the American Bank & Trust Company all the money to pay for same, and neither of the partners made any contribution of capital to the partnership, other than the amount so borrowed. They continued in business under the name Strobel-Thompson Dry Goods Company until March 13, 1929, when Thompson sold his half interest to his partner, Strobel, the bankrupt, for $12,000.00 plus an account, which Thompson owed the partnership, of over $1,100.00; for the purchase money

Strobel executed to Thompson, on the date of sale, four notes of $3,000.00 each, payable one each year on or before the 5th day of January, 1930, 1931, 1932, and 1933, thereafter, and the account of about $1,100.00, which Thompson owed the partnership was cancelled. Dr. A. M. Smith signed said notes for Strobel as surety. The purchase price of Thompson's half interest was therefore between $13,000.00 and $14,000.00.

"(b) At the time of the sale the partnership owed debts in excess of the value of the partnership property. The bankrupt agreed, as a part of the consideration of the sale, to assume and pay the indebtedness of the firm; and while Mr. Thompson testified he did not know the condition of the business at the time of said sale, I find that, being a partner, he knew, or at least is charged with the knowledge of the financial condition of the partnership business at that time.

"(c) I further find that neither the said R. M. Thompson, the retiring partner, L. P. Strobel, the purchasing partner, nor any one for either one of them or for the firm, complied with the Bulk Sales Law of the State of Arkansas, either before or at the time of the sale.

"(d) Mr. Thompson admits that at the time of the sale he neither had an invoice of the stock made, nor a list of the creditors of the firm with the amount of their debts, and says he did not know the value of the stock nor the amount of the indebtedness.

"(e) I further find, that the bankrupt, Strobel, was in the active management of the partnership business from its beginning, and after said sale the business was continued under the name and style of Strobel-Thompson Dry Goods Company, at the same place, and that the name of said firm continued to be displayed upon the store building as a sign, and was not changed; and, that said Strobel continued to do business as Strobel-Thompson Dry Goods Company, used letterheads with that name on them, and issued checks on the Bank in that name as before the sale, and that there was little or no outward manifestation of any change of the business after the sale, except certain news items were published in two local newspapers to the effect that Strobel had bought Thompson out, and some of the creditors received actual notice of the sale after it was consummated, either by letter or word of mouth, and that Strobel advertised a dissolution sale by circulars.

"(f) I further find, that said Thompson and the bankrupt, during the years 1927 and 1928, borrowed $8,000.00 from the Bank, in the firm name, and each received $4,000.00 of said sum in cash, which they appropriated to their individual uses, calling the same a dividend from the business; and that said money was borrowed from the American State Bank of Paris, Arkansas, and that part, if not all of said sum, was unpaid at the time of said sale.

"(g) I further find, that at the date of said sale, March 13, 1929, there were subsisting debts against the partnership for which both partners were equally liable, in excess of $11,000.00, which had not been paid at the time of the filing of the petition for bankruptcy herein, and which have been presented as claims in this proceeding against the bankrupt's estate; and in addition to the partnership debts, still unpaid as aforesaid, there existed at the time of said sale partnership debts, which were paid by Strobel during the year, 1929, amounting to several thousand dollars, probably as much as eight or ten thousand dollars.

"(h) I further find, that the bankrupt's estate, now in process of administration, is not of sufficient value to pay one-half of the partnership debts still existing and filed for probate against the bankrupt's estate herein.

"(i) That neither the said firm, before the dissolution, nor the bankrupt after that kept books or made any attempt to keep books such as would show the condition of said business.

"(j) I find that the Pahotski stock of goods was old and contained a large amount of depreciated goods at the time it was sold to the Strobel-Thompson Dry Goods Company, and that said Company paid only sixty-five cents on the dollar therefor in April, 1925, and that a large portion of the goods on hand at the time of the sale by Thompson to Strobel was of the old Pahotski stock and in October, 1929, included a further accumulation of shelf worn and depreciated goods, and the stock consisted of about one-third of the old Pahotski stock, and that there had been a further accumulation of unsalable merchandise while Strobel-Thompson Dry Goods Company conducted the business; and that the remnants of the old Pahotski stock left and the additional accumulation of depreciated merchandise made up about half the stock of goods on hand; and that at the time the petition for bankruptcy was filed a large portion of the stock consisted of the old Pahotski stock and subsequent accumulations of such unsalable and depreciated merchandise. I further find that when the petition in bankruptcy was filed the schedules show in-

debtedness amounting to $31,110.00, which is probably $3,000.00 or $4,000.00 in excess of the indebtedness at the time of the sale by Thompson to Strobel."

The referee made the following conclusions of law:

"(a) That, as against creditors and especially the creditors whose claims accrued against the partnership, the sale of the one-half interest by Thompson to Strobel was and is void for non-compliance with the Bulk Sales Law of the State of Arkansas.

"(b) That neither of the claims of the said R. M. Thompson are provable in this proceeding against the estate, because the said Thompson can not compete with his own creditors and share in the assets of the bankrupt's estate, and to allow him to do so is inequitable, unjust and contrary to law.

"(c) That said sale, on account of the insolvency of said firm at the time it was consummated, was and is presumptively fraudulent and void as against creditors.

"(d) That said claims should be disallowed; and I have ordered and adjudged accordingly."

The question to be determined on this petition for review is whether the referee was correct in holding that the sale of one-half interest in the stock of goods by Thompson to his partner, Strobel, was in violation of the Bulk Sales Law of Arkansas. The original Bulk Sales Law of Arkansas is found at sections 4870, 4871, and 4872 of Crawford & Moses' Digest of the Statutes of Arkansas. These sections were amended by the Act of the Legislature of March 15, 1923 (Acts 1923, No. 374, p. 340). The amendment simply extended the application of the original act. In the sale by Thompson to Strobel March 13, 1929, the requirements of the Bulk Sales Law were not complied with. The contention of counsel for Thompson is that the Bulk Sales Law of Arkansas is not applicable to a sale of an undivided interest in a stock of merchandise by one partner to another. It is conceded that the Supreme Court of Arkansas has not passed upon that identical question. It is also conceded that the authorities in other states are divided on that point. In Indiana it is held that the Bulk Sales Law is in derogation of the common law, and therefore must be strictly construed. The Supreme Court of Arkansas has not made a specific statement on that point. In the case of Huckins v. Smith, 29 F.(2d) 907, arising under the Bulk Sales Law of Arkansas, the Court of Appeals of the Eighth Circuit states that the statute is remedial and that it should be liberally construed. Without expressly so stating, the Supreme Court of Arkansas has given a liberal construction to the statute. Prins v. American Trust Co., 169 Ark. 455, 275 S. W. 914.

Counsel for Thompson rely upon the case of Schoeppel, Trustee, v. Pfannensteil, 122 Kan. 630, 253 P. 567, 51 A. L. R. 398. In the opinion in that case of the majority of the court, the proposition is stated as follows:

"This appeal presents the question whether the sale of an undivided half interest in a partnership stock of merchandise by one partner to his fellow partner is governed by the Bulk Sales Act."

The facts are stated in the opinion as follows:

"For some time prior to October 1, 1922, E. B. Hopper and Elias Pfannensteil, defendant herein, were partners engaged in merchandising, and owned and operated a mercantile store in Ness City. On that date, defendant purchased the undivided half interest of Hopper for $4,000 in cash. Neither partner made any effort to comply with the provisions of the Bulk Sales Act, nor was any notice given touching the dissolution of the partnership except by oral information to some of the commercial travelers who supplied the partnership store with goods. Prior to October 1, 1922, Hopper's part of the work in conducting the business of the partnership was chiefly that of bookkeeper, for which service he had been drawing $125 per month from the business, and, after the sale of his interest and retirement from the firm, Hopper served the defendant as an employee without change in the nature of his duties or in his monthly stipend.

"On July 1, 1924, Hopper filed a voluntary petition in bankruptcy, and was adjudged a bankrupt on the following day."

The trustee in bankruptcy brought suit against Pfannensteil for an accounting, and based his claim of right thereto upon the provisions of the Bulk Sales Act of Kansas (Rev. St. Kan. 1923, 58—101 et seq.).

After the citation and discussion of a number of cases, the opinion of the majority of the court contains the following statement:

"Our time will not permit us to range further afield in search of analogous decisions bearing on this question; but the cases we have noted are sufficient to show that either view can be supported by respectable authority; and we must adopt that view which preferably commends itself to our own no-

tions of justice. The words of the statute, 'Any part or the whole of a stock of merchandise,' refer to the physical things constituting the stock, and not to the group of interests in the things which constitute property in the true sense. Sale of part of a stock involves severance of some of the things from the others; and sale of the whole involves disposition of all the things in a bulk, without severance of part of them. Sale by one partner to another of his half interest in a stock of merchandise is not a sale of either a part or the whole of the goods, in the sense indicated. There is no segregation of a part, and the selling partner neither owns nor sells the whole. Under the statute, sale involves delivery in the sense of physical change of possession. The purchaser must give notice to creditors at least seven days 'before taking possession,' and the whole effect of the statute depends on this notice. Personal creditors of a partner may not look directly to partnership goods. The statute involves taking possession by one who is a stranger to the relation of debtor and creditor as it affects privilege to appropriate the goods."

The reasoning in the foregoing quotation, as it developed later in the opinion, was not necessary to the conclusion reached by the court.

The opinion of the majority of the court contained also the following statement:

"The evil sought to be remedied by the Bulk Sales Law is this: Without such law a retailer who has purchased his stock largely on credit may sell it for cash, put the proceeds in his pocket and walk off, leaving the wholesaler from whom it was bought without remedy against it, the new purchaser having a perfect title. It is impracticable for the wholesaler to protect himself by taking a chattel mortgage. It is unconscionable that he should be subjected to the wrong of having the goods he has sold on time, and to which he has a moral right to look for payment, put wholly beyond his reach in this manner. But a sale made by one partner to another does not expose the wholesaler to that hardship. It in no way impairs his remedy, and is not within the purpose and meaning of the Bulk Sales Act.

"Under such a sale as that of Hopper to his partner, the stock of merchandise was not physically disturbed, neither the actual nor the legal possession being changed thereby (the purchasing partner prior to its sale having had virtually the same all-inclusive possession of the whole stock of goods as he did after its purchase), and the stock of goods after the sale of Hopper's undivided half interest being just as accessible to the creditors for the satisfaction of their claims for credits extended on account of the partnership, as prior thereto, this court adopts the view that the sale of Hopper's undivided half interest in the Ness City store to his partner, Pfannensteil, in 1922, was not the sort of sale or disposal of a part of a stock of merchandise otherwise than in the ordinary course of trade the Legislature by its enactment of the statute intended to regulate and govern for the protection of creditors."

The statement in the foregoing quotation that "a sale made by one partner to another does not expose the wholesaler to that hardship" was applicable to the facts. In the case before the court, Hopper sold his interest to Pfannensteil for $4,000 in cash. The conclusion of the court in saying that, after the purchase of Hopper's undivided one-half interest, the stock of merchandise was just as accessible to creditors for the satisfaction of their claims for credit as before, is clearly correct. In the purchase made by Pfannensteil, the stock of goods was not in any way depleted, because he paid the purchase price in cash. In this case, however, Strobel did not pay cash. He executed four notes of $3,000 each. It is a fair conclusion from the evidence that the only means that Strobel had to pay these notes was by the sale of merchandise. Upon inventory after bankruptcy, it was found that the goods inventoried a little over $10,000. At trustee's sale, the entire stock, exclusive of the fixtures, sold for something over $3,000.

In his schedules, bankrupt states the amount of his debts to creditors holding securities is $12,693.69. In this amount is included the $12,000 represented by notes executed to Thompson. The bankrupt in schedule A—3 gives the amount he owes creditors who are unsecured to be $18,127.34. He states the amount due on account of wages to be $232.47, and the amount due by him on accommodation paper as $56.56, making a total of debts of $31,110. In schedule B—2, he shows the amount of his stock in trade in his business as a merchant to be $11,000, and gives as the total value of his property the sum of $14,630.09. If Thompson's claims are allowed, the claims of the creditors who furnished the stock of goods will be reduced by the amount of the payments made to Thompson. It is thus clear that the stock of goods in this case represented by the proceeds of the sale are not as accessible to the creditors as if Thompson's claims were not allowed.

The Supreme Court of Arkansas has not passed upon the applicability of the Bulk Sales Law to a purchase by one partner of the interest of another partner. In the opinion in the Kansas Case, from which quotations have been made, the inapplicability of the Bulk Sales Law of that state to such a sale is based on the ground that the sale by one partner of his interest in a stock of merchandise to another partner is not a sale in the sense intended in that statute, because there is no segregation of the part sold, nor is there change of physical possession.

In the case of Swafford v. Ketchum, 177 Ark. 1152, 9 S.W.(2d) 806, 807, defendants were sought to be held liable for a sale of a stock of goods without complying with the requirements of the Bulk Sales Law of Arkansas. Five defendants were involved. The debt sued on was contracted originally by two of them as partners. Afterwards a third defendant purchased an interest in the business with notice of the debt of the plaintiff Swafford. Later a fourth defendant, Ketchum, purchased one-half interest in the business, and later it appears that the entire business was sold to defendant Sullivan. In the trial court three defendants were held liable. Ketchum and Sullivan were held not liable. The original creditor, Swafford, appealed to the Supreme Court from that part of the chancellor's decree which absolved Ketchum and Sullivan. The Supreme Court sustained the decree of the lower court on the ground that Ketchum and Sullivan had sought in good faith to ascertain the names of creditors of the partnership. With reference to Ketchum and Sullivan, the court said:

"There is nothing to show bad faith on the part of either one. Each demanded and was given what purported to be the name of the only creditor the firm had. Ketchum paid what was represented to him to be the only claim. Sullivan paid what was represented to him to be the only claim against the firm. The statute therefore affords no protection to Swafford, because Ketchum and Sullivan each acted in good faith in the purchase of the stock of goods, and each was in entire ignorance of the fact that Swafford had a claim against the firm."

It is significant that in this case the question of actual physical delivery of the part of the stock of goods purchased was not raised. The applicability of the Bulk Sales Law appears to have been taken for granted both in the trial court and the Supreme Court.

In the claim of Thompson based upon his payment of a judgment against himself, it appears that he and Strobel were sued on an account for goods purchased by the firm prior to March 13, 1929. Thompson bases his right to file that claim against the trustee in bankruptcy on the ground that Strobel, at the time of his purchase of Thompson's interest, agreed to assume all of the debts of the partnership. That claim stands on the same basis as the notes given for the purchase price.

I think the rule of liberal construction to correct the evil aimed at by the Bulk Sales Law of Arkansas required that the law shall be held to apply to a sale of his interest in a stock of goods by one partner to his copartner.

In the case of Prins v. American Trust Co., 169 Ark. 455, 461, 275 S. W. 914, the Supreme Court of Arkansas expressly held that the Bulk Sales Law is not limited to those creditors who have extended credit on the mercantile business, but is for the protection of all creditors of the seller.

The orders of the referee will be affirmed.